Magistrate Judge Mary Alice Theiler

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM ALI,<br><br>Defendant. | CASE NO.<br><br>COMPLAINT for VIOLATION<br><br>Title 22, U.S.C.<br>Section 2778(c) |

BEFORE, Mary Alice Theiler, United States Magistrate Judge, U. S. Courthouse, Seattle, Washington.

The undersigned complainant being duly sworn states:

### COUNT ONE
### (Arms Export Control Act)

On or about April 11, 2016, at Seattle, within the Western District of Washington, and elsewhere, WILLIAM ALI did willfully attempt to export from the United States defense articles designated on Category XII(d) of the United States Munitions List, International Traffic in Arms Regulations, namely QA3000-10 and QA-3000-020 accelerometers, without having obtained from the United States Department of State a license or written approval for the export of the defense articles.

All in violation of Title 22, United States Code, Section 2778(b)(2) and (c), Title 22, Code of Federal Regulations, Parts 121.1, 123.1, 126.1, and 127.1(a).

And the complainant states that this Complaint is based on the following information:

I, Christy Clerf, being first duly sworn on oath, depose and say:

## INTRODUCTION

1. I am a Special Agent with the U.S. Department of Homeland Security (DHS), Homeland Security Investigations (HSI), assigned to the Office of the Special Agent in Charge (SAC), Seattle, Washington. I have been employed as a Special Agent with HSI since 2006. I am currently assigned to the Counter-Proliferation Investigations (CPI) Group, where I investigate cases involving the illegal export of weapons and other items from the United States.

2. I have received formal training at the Federal Law Enforcement Training Center in Glynco, Georgia. Based on my training and experience, I am familiar with the manner in which individuals illegally acquire and export controlled merchandise from the United States to foreign countries.

3. As outlined below, there is probable cause to believe that WILLIAM ALI willfully attempted to export accelerometers from the United States to China without obtaining a required export license.

## RELEVANT LAW

4. The President of the United States ("President"), pursuant to the Arms Export Control Act, 22 U.S.C. § 2778 ("AECA") designates articles and services deemed to be defense articles and defense services subject to import or export controls. The President has delegated to the Secretary of State the authority to control the export and temporary import of defense articles and services.

5. The State Department's Directorate for Defense Trade Controls, Bureau of Political-Military Affairs ("DDTC") is the office responsible for administering the defense export regulations created by the AECA and implemented by the International Traffic in Arms Regulations (22 C.F.R. Parts 120-130) ("ITAR"). The items designated by the Secretary of State for purposes of export and temporary import control constitute

the U.S. Munitions List ("USML), specified in 22 C.F.R. Part 121. Further, it is the U.S. policy to deny licenses and other approvals for exports and imports of defense articles and defense services, destined for or originating in certain countries, including countries with respect to which the United States maintains an arms embargo, such as China. 22 C.F.R. Part 126.1.

6. As discussed below, this case involves, among other things, accelerometers. Based on my training and experience, I know that an accelerometer is a device that measures proper acceleration. As detailed below, the State Department determined that at least two of the accelerometers that are the subject of this case are designated on the USML, and thus cannot be exported without obtaining a license from DDTC.

## BACKGROUND OF INVESTIGATION

### A.     The Initial Inquiry

7. On April 21, 2015, WILLIAM ALI emailed Company A. I have reviewed a copy of this email. ALI requested pricing and availability for 18 QA3000-010 accelerometers. ALI also requested 12 QA3000-020 accelerometers, in the form of two duplicate requests of six QA3000-20 accelerometers. ALI further wanted confirmation that the items would be supplied with a Certificate of Conformity. ALI provided his company name as Aircraft Mechanics & Logistics with an address in New Zealand. Company A did not supply ALI with the requested parts.

8. I conducted an internet search of "Aircraft Mechanics & Logistics, New Zealand" using an online search engine. The search returned negative results for a company website, but did return a user profile for "William Ali" on the social networking website "LinkedIn," New Zealand. ALI's LinkedIn biography states he is in "Sales & Support" at Aircraft Mechanics & Logistics and mentions dealing in Harbin Y12 and Xian MA60 aircraft spares. Open source data shows both of these aircraft are twin-engine turboprops manufactured in China; it appears that both aircraft can be used for cargo and passenger transportation and both have military variants.

9. I know based on my training and experience, as well as from conversations I have had with others who are experts on the subject matter, that the QA3000-010 was developed for low and zero gravity inertial navigation systems that are used in spacecraft and are not meant to be used in general aircraft.

10. On April 23, 2015, ALI sent a request for quote to a second company, Company B, for QA3000 accelerometers. I have reviewed this request for quote. Company B did not supply ALI with the requested parts.

**B.  The Undercover Contact with ALI**

11. On May 19, 2015, an undercover agent (UCA) emailed ALI. The UCA mentioned working for a commodities firm in the Pacific Northwest (of the United States) and indicated being able to possibly procure the accelerometers. The UCA asked ALI for his product request.

12. On May 19, 2015, ALI replied that he had a request for U.S. components, and if the UCA were able to supply them, "there will be a guarantee in further orders as the demand is currently high." ALI provided the following list of items that he wished to acquire:

Accelerometer QA-3000-010 x 18

Accelerometer QA-3000-020 x 6

Accelerometer QA-3000-020 x 6 (duplicate of above)

Laser Gyro GG1320AN x 8

Quartz Accelerometer RBA500 x 12

In addition, ALI requested the following items.

Gyro QRS116 x 8

IMU SD1500 [sic] x 4 (actual product name is SDI500)

MEMS IMU SiIMU02 x 20

ALI stated in his email: "These are all big ticket items so we're looking for an opening here, but must all be OEM as there are also equivalents out in the market."

COMPLAINT/ALI - 4

13. On May 21, 2015, the UCA emailed ALI and explained that, due to the controls on the products he had requested, it could take some time to acquire them. The UCA expressed having associates who were confident the items were attainable, but that they might need to start out with smaller quantities than what ALI had requested.

14. On May 21, 2015, ALI responded to the UCA's email and stated he could amend the quantity. ALI asked the UCA how much the UCA could supply.

15. On June 4, 2015, ALI emailed the UCA to ask about the UCA's progress.

16. On June 5, 2015, the UCA emailed ALI and mentioned the items were difficult to acquire, but that the UCA should have an available count of the products by the end of the following week.

17. On June 17, 2015, the UCA emailed ALI the following quote:
QA-3000-10, QTY: 6-10, $10,000/each, 6-8 week lead time
QRS116, QTY: 5, $4500/each, 6-8 week lead time
The UCA also said he had access to the following: "QRS28, QTY: 12, $4000/each, 6-8 week lead time." The UCA stated, "All of these items are highly regulated by the U.S Gov't. Did you plan on filing for the appropriate licenses or what other ideas did you have for this transaction to take place? Please let me know how you wish to proceed and if I can be of any assistance in helping to expedite the delivery of these products."

18. On June 17, 2015, ALI emailed the UCA: "I believe going through the licenses might be a hard line to follow given the restrictions in place. The only way I feel we can expedite these is if we simply purchased from you and you can ship via normal courier to us?"

19. On June 18, 2015, ALI emailed the UCA and asked for photographs of each product. ALI further stated that the lead times provided by the UCA were acceptable and that a continued long-term supply would be an added bonus.

20. On June 22, 2015, the UCA emailed ALI and expressed concerns that ALI's suggested delivery method would put all of the risk on the UCA because a license was required for the export. The UCA inquired if ALI had success in the past receiving

1 products requiring licenses through a courier or if ALI had other suggestions for delivery
2 options.
3     21.    On June 22, 2015, ALI emailed the UCA and replied that he had never
4 obtained these products in the past, and wasn't sure about getting the licenses. ALI
5 wrote, "From my survey, the only way possible I see this happening is obtaining them via
6 a US based company as I believe the restrictions are imposed for exportation. I am not
7 very confident that we would be able to get the license. Do you have any suggestions for
8 delivery with minimum risk?"
9     22.    On June 24, 2015, the UCA placed a phone call to a phone number
10 provided by ALI through email. During this conversation, the UCA explained that the
11 legal way to get the products was to request a State Department license. ALI
12 acknowledged he didn't think the license would get approved, stating "The end user is in
13 China." ALI said that he thought that the U.S. accelerometer manufacturer did not export
14 the products at issue to China, and thus the Chinese typically purchased the products
15 from a local Chinese plant instead. ALI stated the cost was high and the products did not
16 work as well as the U.S. products, which is why the Chinese wanted genuine OEM
17 products.
18     23.    ALI stated the Chinese wanted a huge quantity of the product as they were
19 manufacturing a variant of the MA60 aircraft and wanted to use the product on that
20 aircraft system. ALI said the Chinese were going through him for the product because he
21 had provided MA60 parts for them in the past, and had established trust with them. ALI
22 stated this was the first time the Chinese has come to him for the specific accelerometers
23 being discussed with the UCA.
24     24.    ALI acknowledged that he was aware that not getting a license was
25 violating U.S. law. Specifically, the UCA stated: "I just want to make sure that you're
26 aware that, I mean, why us not getting a license, and we're obviously violating US law, I
27 just want to make sure that you're aware of that." ALI responded, "Yeah." The UCA
28 later stated: "I mean there's ways… we can…minimize our risk and that's the way we

1  should do it if we want to continue long term. So that's why I wanted to talk to you in
2  person so we can kind of come up with, you know, or at some point I'd like to talk to you
3  in person. . . ." ALI responded, "I had some thought on that and I thought that maybe...
4  the best way would be just, um, a hand, you know, just a safe delivery, so just hands-on?
5  Either someone goes over to the U.S. or U.S. to New Zealand would be the only bet....
6  And I already learned that the Chinese, uh, yes, so they happy to cover cost for that . . . ."

7      25.     The UCA asked ALI to let the Chinese know that if the UCA traveled they
8  would have to cover the UCA's cost, plus a little extra. ALI replied, "I've already, uh,
9  sent them an email and I've got confirmation."

10     26.     ALI stated he had bought parts from the U.S. and managed to obtain
11 licenses for them, but for this one he "did a bit of background research...and the only
12 way I could see getting it was through a U.S. based company."

13     27.     ALI brought up the QRS28 that the UCA had offered in the email dated
14 June 17, 2015. Ali stated he didn't request those, but "they will also want those ones"
15 and he would confirm the quantity at a later date.

16     **C.**     **The Chinese Customer**

17     28.     During the course of the investigation, I obtained multiple search warrants
18 for ALI's email account. I seized emails showing that ALI was coordinating with a
19 person in China who understood that the accelerometers at issue in this case could not be
20 legally exported to China from the United States.

21     29.     Specifically, according to seized emails, on or around July 17, 2014, ALI
22 emailed several email addresses introducing himself as a regional operator of MA60
23 turboprop aircraft and requesting aircraft spares support. ALI received a response from
24 an aircraft trading company in China and began conversing with an individual who called
25 himself "Michael."

26     30.     Between July 18, 2014 and February 10, 2015, ALI emailed Michael about
27 pricing and availability of various spare aircraft parts. There are no emails that support
28 an actual sales transaction took place between these two individuals.

31. On or around April 20, 2015, Michael emailed ALI asking if he was able to procure U.S.-manufactured accelerometers. Attached to Michael's email was a manufacturer's data sheet for the QA3000 accelerometer. Michael stated in a following email to ALI that these accelerometers are not officially allowed to be exported directly from the U.S. to China and to consider the risk when helping to buy the products.

32. Between April 20, 2015 and May 20, 2015, ALI emailed several companies and/or individuals about obtaining the accelerometers, including Company A and Company B previously mentioned.

33. Between April 21, 2015 and July 1, 2015, Michael and ALI discussed pricing, availability, and lead time of the QA3000 accelerometer and other export-controlled commodities. Michael informed ALI that the products would be used in various Chinese aircraft, including the MA60.

D. **The Continued Undercover Contacts with ALI**

34. On September 1, 2015, the UCA emailed ALI asking for a list of the top five commodities his customer most desired for the first deal. On September 2, 2015, ALI emailed the UCA such a list. On September 22, 2015, the UCA sent ALI the following quote per item, totaling $29,200:

QA-3000-010 @ $8150

QA-3000-020 @ $11000

QRS-116 @ $3100

QRS-28 @ $2650

QA-T185 @ $4300

35. According to seized emails, on October 12, 2015, Michael emailed ALI that $5,000 had been transferred to ALI's bank account. On October 18, 2015 and on October 26, 2015, Michael emailed ALI that $10,000 had been transferred to ALI's bank account, for a total of $25,000. Attached to each email was a Bank of China funds transfer form showing the remitter's name, M.X.

COMPLAINT/ALI - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

36. On October 27, 2015, ALI emailed the UCA that his client had agreed to release funds up to $15,000 and that ALI would contribute $5,000 at the time the order was placed. ALI stated that the final balance would be payable when he had received the units and added, "So they will not be released to China until the balance is paid up in full."

37. On November 7, 2015, ALI emailed the UCA, "I've got 10k in. Will get another payment next week."

38. On November 17, 2015, ALI emailed the UCA that he would not be purchasing the QA-T185 as "the end user already has a supplier for this at a marked price of $2300 US."

39. On November 18, 2015, ALI emailed the UCA that he would make a payment on the rest of the products quoted, totaling $24,900. ALI stated he was ready to make the $15,000 down payment and would pay the balance when the UCA confirmed the delivery date and pick-up point.

40. On November 24, 2015, the UCA emailed ALI that the pick-up would be in Seattle, Washington, and that ALI should begin preparations to come to the U.S. in January or February for delivery.

41. On November 24, 2015, ALI emailed the UCA a document that showed confirmation of a $15,000 wire transfer sent to an HSI undercover bank account. The document showed the sender's bank as ANZ Bank New Zealand Limited. The "Message to recipient" field read, "[Name of U.S. Manufacturer] Product Purchase." The "Reason for sending money" field read, "Trade Payment/Purchase of Goods." The funds were deposited into the HSI undercover bank account on November 25, 2015.

D.  **The Undercover Meeting**

42. On January 19, 2016, ALI emailed the UCA that he was in Australia for work for a month. ALI mentioned he would have to get his visa sorted out once he was back in New Zealand and suggested he would either pick up the items himself or

alternatively have a friend/former colleague who resides in the U.S. make all the necessary shipment arrangements.

43. On February 11, 2016, ALI emailed the UCA a document that showed confirmation of a $9,900 wire transfer sent to an HSI undercover bank account. The document showed the sender's bank as ANZ Bank New Zealand Limited. The "Message to recipient" field read, "Full Payment Now Complete for [Name of U.S. Manufacturer] Units." The funds were deposited into the HSI undercover bank account on February 12, 2016.

44. On February 25, 2016, ALI and the UCA spoke via telephone during which ALI stated he had been planning to come up to meet the UCA, but would be going to Fiji for a month to assist his family. ALI stated his partner of thirteen years would soon be flying into California to perform inspections for a few days, then would travel to Florida to do the same. ALI asked the UCA to mail the items to his partner using a mail tracking service so that his partner could take the items back to New Zealand in his checked luggage. ALI stated his partner knew about the restrictions placed on the items.

45. On March 3, 2016, ALI and the UCA spoke over the telephone. ALI stated that his partner was currently in Florida and would depart to New Zealand the following week, either through San Francisco or Los Angeles. The UCA expressed concern that ALI's friend would not get through airport security when flying back. The UCA purported to have an associate at the Seattle airport that could get the items through security without any problem. The UCA stated his/her associate may know someone who could help ALI's partner exit San Francisco or Los Angeles with the items, but that option would be more risky. ALI stated if his partner confirmed he was flying back with the items, his customers would pick up them up in New Zealand.

46. On March 7, 2016 ALI emailed the UCA that his partner would be leaving Los Angeles on March 9, 2016 to head back to New Zealand. ALI then suggested he and the UCA meet in Hong Kong for delivery, after which ALI would travel to China with the items. The UCA responded being uncomfortable with flying to Hong Kong with the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  items and proposed U.S. territories as alternate locations. ALI later suggested they meet
2  in Singapore, but the UCA declined, stating it was too risky. ALI said delivery to his
3  customer was now planned in China at their headquarters to allow his customer to test
4  and verify the units. ALI mentioned being in China for a week to secure a long term
5  contract for supplying the units.
6      47.    On March 9, 2016, the UCA asked ALI how long it would take to get a visa
7  to the United States. ALI responded it would take 30 days and suggested as an
8  alternative he could meet the UCA in Australia to secure delivery as his Australian visa
9  was still valid. ALI then phoned the UCA to discuss the delivery options and the risks of
10 using various port of entry/exit locations.
11     48.    On March 10, 2016, the UCA asked ALI what he has decided to do, to
12 which ALI responded, "I'm coming up to Seattle."
13     49.    On March 16, 2016, ALI emailed the UCA stating he estimated his travel
14 date to the United States would be April 5.
15     50.    On March 23, 2016, ALI emailed the UCA that his client wanted proof that
16 ALI had possession of the items. ALI attached a photograph of the front page of the New
17 Zealand Herald and asked if the UCA could take a photograph of the items with the
18 newspaper and send it to him. ALI stated his customers wanted to start processing the
19 next order of items and that the photograph would give them confidence to do so.
20     51.    On April 11, 2016, ALI arrived in Seattle. He met the UCA and picked up
21 the accelerometers. He was then arrested.
22     **E.    License History and Determination**
23     52.    As set forth above, ALI requested the following products from the UCA:
24 (1) QA-3000-010; (2) QA-3000-020; (3) QRS-116; (4) QRS-28; and (5) QA-T185.[1]
25     53.    The DDTC has issued a pretrial certification that the QA3000 model
26 accelerometers are covered by the USML and therefore ITAR-restricted. I am awaiting

---

[1] As noted above, ALI subsequently cancelled his request for the fifth product on the list, the QA-T185.

pretrial certifications for the remaining products, but, based on my training and experience, I believe that the remaining products also require some form of export license before they can be exported.

54.  A search of DHS export databases for "William Ali" and "Aircraft Mechanics & Logistics" indicates that neither has previously obtained a DDTC license for export.

55.  A search of DHS export databases for "Aircraft Mechanics" returns a shipment of "aircraft spares" from the U.S. to "Aircraft Mechanics Logistics" at 34 Corrin Street, Melville, Hamilton, 3206, NZ, in December 2014.  The record shows no license was required from DOC BIS for this shipment.

## CONCLUSION

56.  Based on the above facts, I respectfully submit that there is probable cause to believe that WILLIAM ALI did knowingly and willfully attempt to export ITAR-controlled accelerometers without an export license, in violation of Title 22 United States Code, Section 2778(c).

Christy Clerf, Complainant
Special Agent, HSI

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe the Defendant(s) committed the offense set forth in the Complaint.

Dated this  12  day of April, 2016.

MARY ALICE THEILER
United States Magistrate Judge